### BANKERS TRUST CO. et al. v. FLORIDA EAST COAST CAR FERRY CO. et al.
### No. 8387.

Circuit Court of Appeals, Fifth Circuit.

Oct. 18, 1937.

Henry P. Adair and C. G. Ashby, both of Jacksonville, Fla., and Francis L. Casey, of New York City, for appellants.

Edw. McCarthy, Jr., J. W. Shands, E. J. L'Engle, Robert H. Anderson, and Russell L. Frink, all of Jacksonville, Fla., for appellees.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The Florida East Coast Railway Company was by its consent put into receivership on Aug. 31, 1931, on allegations, not that it was insolvent, but unable to meet its maturing obligations and was losing money. On May 12, 1932, the trustees of its bond mortgage sought foreclosure and a receivership to collect the railway's income which was covered by the mortgage, and the same receivers were named and the cases were consolidated. During March, 1932, the

Commissioner of Internal Revenue adjusted the incomes taxes on certain returns for 1924, 1925, and 1926, as a result of which, with some further adjustment, overpayments were found which with interest amounted to more than a hundred thousand dollars, which sum was paid to the receivers. The court ordered this fund impounded till its true ownership could be ascertained.

The appellees are all corporations owned by the same persons as the Railway Company, and the income tax returns above mentioned were all consolidated returns made by the Railway Company for itself and appellees as affiliates. With each return the estimated taxes were paid, each affiliate contributing in proportion to its net income as shown by the return. On July 22, 1929, the Commissioner of Internal Revenue wrote the Railway Company, suggesting that the affiliates make an agreement allocating the tax, as permitted by section 240 of the Revenue Acts of 1924 and 1926, "so that the closing of the above returns may be expedited"; and he enclosed for signature an agreement reading thus: "The undersigned corporations hereby agree that any deficiency of income tax computed upon the basis of a consolidated return for the years 1924, 1925, and 1926 may be assessed against and/or any over-assessment of such tax for the above named years may be abated, credited or refunded to the Florida East Coast Railway Company." The corporations all executed it and filed it with the Commissioner. When the refund was made to the receivers in 1932, the Commissioner referred to this agreement as authorizing payment to the Railway Company alone. The appellees intervened in the receivership, claiming that $96,000 (in round figures) of the refund was their money and not that of the Railway Company, and prayed that the receivers be directed to pay it over to them. They further set up that the refund to them would have been greater by $99,000 (in round figures), but that that much of their overpayments had by authority of the allocation agreement been applied by the Commissioner in the adjustment to cover underpayments by the Railway Company, and that since the claim of the United States against the Railway Company had priority because of the receivership, and since their money had been taken to discharge it, they should be subrogated to the position of the United States and be awarded additionally a priority claim of $99,000 against the general funds of the Railway Company in the receivers' hands. The interveners, now appellees, obtained a decree for the $96,000 which they claimed from the impounded fund, and also for $99,000 as a priority claim to be paid forthwith from the general moneys in the receivers' hands arising from the operation of the railroad. The trustees in the bond mortgage have appealed. They contend that the refund belongs to the Railway Company under the allocation agreement; and as to the $99,-000 that the United States had no priority claim against the receivership; that the appellees show no right to subrogation, if there was priority; and that the general moneys in the receivers' hands fall under their mortgage lien which would outrank any priority due the United States.

The ownership of the $96,000 refunded by the Commissioner to the receivers depends on the construction of the allocation agreement. Aside from it, each affiliate in the consolidated return owed severally its part of the consolidated tax according to the proportion their several net incomes bore to each other. The Commissioner was bound to assess each accordingly, and if there were overpayments or underpayments found he must adjust with each taxpayer accordingly. The provision of section 240 of the Revenue Acts of 1924 and 1926 (43 Stat. 288, 44 Stat. 46) is: "In any case in which a tax is assessed upon the basis of a consolidated return, the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or, in the absence of any such agreement, then on the basis of the net income properly assignable to each." An agreement among the affiliates relieves the Commissioner of the responsibility of apportioning the tax. The particular agreement here suggested by him enabled him to deal with only one taxpayer and to make but one assessment or refund. He suggested it to expedite the closing of the returns. We think that was the sole purpose of its signers. Its words do not import that the Railway Company was assuming any additional taxes that might be assessed against the appellees, nor that they were assigning to it any refunds to which they might be found entitled. A similar agreement was made about the return for 1923, and when a refund was made it was divided by them as it would have been had there been no such agreement. We approve the finding

of the master and the District Judge that the allocation agreement was not an effort to fix the true proportions in which the tax should be borne, but merely made the Railway Company the agent or trustee of the other parties, and did not at all affect as among themselves their several rights or liabilities. When it was ascertained that the net income of the Railway Company had been greatly understated and that of the appellees had been overstated, the refunds which were due belonged to the taxpayers who had overpaid. Since this agreement was not recalled when the Railway Company was put in receivership, the Commissioner rightly paid the refund due to appellees over to the receivers, but the receivers have no more right to keep it than the Railway Company would have had. The court rightly awarded this $96,000 to appellees.

 By virtue of the allocation agreement, the Commissioner appropriated an additional $99,000 of overpayments made by appellees to pay the additional taxes which the Railway Company would owe if separately assessed. Those for 1924 were separately assessed before the agreement was made, and for them especially a priority in the United States is asserted. The appropriation of the appellees' credits to the tax liabilities of the Railway Company occurred during the consent receivership and before the mortgage lien on income was asserted. Questions are raised whether at that time there existed such insolvency as gave the United States priority under R.S. § 3466 (31 U.S.C.A. § 191); and, if so, whether the receivers have any money not under the mortgage lien, and not exhausted by the "six months claims" existing at the beginning of the first receivership, all these being contended to be of superior rank to any priority of the United States. See United States v. Guaranty Trust Co. (C.C.A.) 33 F.(2d) 533, and affirmance in 280 U.S. 478, 50 S. Ct. 212, 74 L.Ed. 556. We need not determine these questions, for we are of opinion that the appellees show no case for subrogation. This $99,000 refund cred-

it did in truth belong to them and was used to satisfy claims of the United States against the Railway Company, but it never reached the hands of the receivers nor did anything representing it. It cannot be traced into the receivership assets. The Railway Company owes them reimbursement, but they have no claim as owners against the funds of the receivers. They must, as they do, rely on subrogation to the priority right of the United States, assuming its existence. But their money was used to pay the Railway Company's taxes by virtue of the allocation agreement, that is, by their consent. In giving the consent there was no stipulation that the discharged claims against the Railway Company, if any, should be kept alive, nor for any sort of security. There is no basis for any conventional subrogation. Legal subrogation fails because of the free consent by the owners to this use of their money. The appellees did not owe the taxes of the Railway Company either jointly or as sureties, and they had no interest in the Railway Company, to protect which they were compelled to pay its debt. They probably did not anticipate the insolvency of the Railway Company in giving consent, but the mere occurrence of insolvency is no sufficient ground to extend legal subrogation to one who has voluntarily paid another's debt. Ætna Life Ins. Co. v. Middleport, 124 U.S. 534, 8 S. Ct. 625, 31 L.Ed. 537; Prairie State Bank v. United States, 164 U.S. 227, at page 231, 17 S.Ct. 142, 41 L.Ed. 412; Sackett v. Stone, 115 Ga. 466, 41 S.E. 564; Wilkins, Neely & Jones v. Gibson, 113 Ga. 31, 47, 38 S.E. 374, 84 Am.St.Rep. 204; Seeley v. Bacon (N.J.Ch.) 34 A. 139; Skinner v. Tirrell, 159 Mass. 474, 34 N.E. 692, 21 L. R.A. 673, 38 Am.St.Rep. 447; Good v. Golden, 73 Miss. 91, 19 So. 100, 55 Am.St. Rep. 486. The appellees have only a common claim against the Railway Company for the $99,000. It should not have been ordered paid forthwith, but should stand for payment with other common claims. The decree is modified accordingly, and, as so modified, is affirmed, with costs of appeal to appellants.